1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   LEWIS JENKINS,

11              Petitioner,              No. CIV S-04-1656 FCD GGH P

12        vs.

13   STEVE CAMBRA, et al.,

14              Respondents.          FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.  Introduction

17              Petitioner is a state prisoner proceeding through counsel with a petition for writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2001 conviction for grand

19   theft from a person in violation of Cal. Penal Code § 487(c).  Petitioner is serving a sentence of

20   29 years to life pursuant to the Three Strikes Law.

21              Petitioner challenges his conviction on two grounds: 1) ineffective assistance of

22   counsel; and 2) his sentence violates the Eighth Amendment.  After carefully reviewing the

23   record, the court recommends that the petition be denied.

24   II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

25              The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this

26   petition for habeas corpus which was filed after the AEDPA became effective.  Neelley v. Nagle,

138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 117 S. Ct. 2059 (1997).  The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions.  While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at 1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

1    The state courts need not have cited to federal authority, or even have indicated

2    awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

3    Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

4    contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

5    unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

6    occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

7    established Supreme Court authority reviewed must be a pronouncement on constitutional

8    principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

9    binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

10    However, where the state courts have not addressed the constitutional issue in

11    dispute in any reasoned opinion, the federal court will independently review the record in

12    adjudication of that issue.  "Independent review of the record is not de novo review of the

13    constitutional issue, but rather, the only method by which we can determine whether a silent state

14    court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

15    2003).

16    In reviewing a state court's summary denial of a habeas petition, this court must

17    "look through" the summary disposition to the last reasoned decision.  Shackleford v. Hubbard,

18    234 F.3d 1072, 1079 n. 2 (9th Cir. 2000).

19    III.  Discussion

20    The opinion of the California Court of Appeal contains a factual summary of

21    petitioner's offense.  After independently reviewing the record, the court finds this summary to

22    be accurate and adopts it below:

23    On August 21, 2000, Rosemont Louissant, a school custodian, reported for work
       at 7:00 a.m., and observed a man sleeping on a picnic table on the grounds of the
24    school.  He unsuccessfully tried to awaken the man, but when he noticed a gun
       lying on the table next to the man he went to call the police.  From inside the
25    school, he observed Jenkins and Charlesetta Jackson approach the man.  Jackson
       testified that Jenkins reached into the man's pockets and took some money.  She
26    also saw Jenkins toss a gun into some bushes as he walked away.  A police officer

1    arrived at the scene and detained Jackson and Jenkins. The victim stated that he
     felt someone hold his head down and go through his pockets, and that he was
2    missing three fives and seven ones.  Bills in the same denominations were
     recovered from Jenkins pockets.
3
     The jury convicted Jenkins of one count of grand theft from the person, but was
4    unable to reach a verdict on additional counts of grand theft of a firearm (§ 487,
     subd. (d)) and possession of a firearm by a felon (§ 12021, subd. (a)(1)).  The
5    court declared a mistrial with respect to these counts.

6    Jenkins trial counsel filed a motion to strike the priors, which the court denied.
     Upon Jenkins request, a new attorney was appointed to file a motion for a new
7    trial, based upon ineffective assistance of counsel.  The court denied the motion
     for a new trial and a renewed motion to strike the prior "strike" convictions, or to
8    reduce the current offense to a misdemeanor. [Footnote omitted.]

9    **Jenkins's Personal and Criminal History**

10   Jenkins was convicted of robbery in 1977.  While on parole, he committed
     another robbery and was convicted for that offense in 1980.  The court sentenced
11   him to four years in prison, and a one-year prior prison term enhancement.  He
     was released on parole in July 1982.  He violated parole in March of 1983, and
12   was paroled again in January 1984.

13   Then, in October of 1984, he was convicted of grand theft from the person, with a
     prior prison term allegation, and sentenced to five years in prison.  In February of
14   1988, while on parole, he was charged and convicted of violating Health and
     Safety Code section 11350 and sentenced to four years in prison.  In October of
15   1989, after being on parole for less than a month, he violated parole, and was
     returned to prison.  Within months of his February 1990 release on parole, he was
16   charged with committing another robbery.  The robbery charge was dismissed and
     handled as another parole violation, resulting in his return to prison.  In January of
17   1992, a few months after being released on parole, he was arrested for being a
     felon in possession of a firearm, which again was handled as a parole violation,
18   and in July violated parole yet again.

19   In December of 1992, a jury convicted Jenkins of violating Health and Safety
     Code section 11352, and the court sentenced him to eight years in prison.  In the
20   first two years on parole, from 1998 through 2000, he violated parole multiple
     times, and incurred three misdemeanor convictions, culminating in the current
21   offense.

22   Jenkins had a history of abusing cocaine.  The probation officer's report observed
     that Jenkins "never actively sought treatment while imprisoned or on parole."
23   Although he finally expressed interest in addressing his substance abuse problem,
     "his poor performance while on probation and parole prompts doubt that the
24   defendant would remain compliant with terms and conditions."

25   Respondent's Exhibit E, p. 2.

26   /////

4

A.  Ineffective Assistance of Counsel

*Standards for Ineffective Assistance of Counsel*

The test for demonstrating ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).  First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  Strickland, 466 U.S. at 688, 104 S. Ct. at 2065.  To this end, the petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment.  Id. at 690, 104 S. Ct. at 2066.  The federal court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance.  Id., 104 S. Ct. at 2066.  "We strongly presume that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689, 104 S. Ct. at 2065).

Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at 693, 104 S. Ct. at 2067.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694, 104 S. Ct. at 2068.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id., 104 S. Ct. at 2068.

In extraordinary cases, ineffective assistance of counsel claims are evaluated based on a fundamental fairness standard.  Williams v. Taylor , 529 U.S. 362, 391-93, 120 S. Ct. 1495, 1512-13 (2000), (citing Lockhart v. Fretwell, 113 S. Ct. 838, 506 U.S. 364 (1993)).

The Supreme Court has recently emphasized the importance of giving deference to trial counsel's decisions, especially in the AEDPA context:

> In Strickland we said that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."

466 U.S., at 689, 104 S.Ct. 2052.  Thus, even when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a [petitioner] must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Ibid. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

For [petitioner] to succeed, however, he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly.  See Williams, supra, at 411, 65 S. Ct. 363.  Rather, he must show that the [ ]Court of Appeals applied Strickland to the facts of his case in an objectively unreasonable manner.

Bell v. Cone, 535 U.S. 685, 698-699, 122 S. Ct. 1843,1852 (2002).

*Analysis*

On direct appeal, the California Court of Appeal explained its reasons for denying this claim.  Respondent's Exhibit E.  The California Supreme Court denied the petition for review without comment or citation.  Respondent's Exhibit I.  Accordingly, the court looks through the decision of the California Supreme Court to determine whether the explained decision by the California Court of Appeal was objectively reasonable.

Petitioner alleges that the attorneys who represented him during sentencing were ineffective for failing to investigate and present evidence of his mental illness and traumatic childhood in support of his Romero motion.[1]  The background to this claim is as follows.

On October 23, 2001, petitioner's trial counsel, Mr. McBride, brought a Romero motion in the trial court requesting that the court exercise its discretion to strike petitioner's Three Strike allegations.  See Reporter's Transcript from October 23, 2001.  The two prior convictions were both for robbery, occurring in 1977 and 1980.  CT at 16-18.  At the hearing on this motion, Mr. McBride argued that the two strikes were 21 and 24 years old.  October 23,

---

[1]  In People v. Superior Court (Romero), 13 Cal.4th 497, 53 Cal.Rptr.2d 789 (1996), the California Supreme Court found that under the Three Strikes Law, a trial judge has the discretion to dismiss a prior felony conviction allegation absent the prosecutor's consent.

6

2001, Reporter's Transcript, p. 5.  Mr. McBride also argued that the victim was not "all clean" as he had a loaded gun on the table.  Id.  He further argued that petitioner had expressed remorse. Id.

In denying the Romero motion the court stated,

> All right.  Your motion to strike the priors pursuant to Ramiro [sic] is denied.  I think Mr. Jenkins is an individual within the spirit of the three strikes law.  His history is long and continuing.

> And I agree with the District Attorney's comment that there is nothing in the record that indicates that the prior should be stricken.  On the contrary, I think if I did strike the priors, it would be a misuse of Court discretion.

Id., p. 7.

At the conclusion of the October 23, 2001, hearing, the court appointed attorney Mr. Riggs to assist petitioner in bringing a new trial motion.  Id., p. 9-10.  On December 14, 2001, a hearing was held regarding petitioner's new trial motion.  At the conclusion of the hearing, the trial court denied the new trial motion.  Transcript from December 14, 2001, pp. 20-21.  The court then relieved Mr. McBride of his duty to represent petitioner and appointed Mr. Riggs to represent petitioner at judgment and sentencing.  Id., p. 21.

At the December 21, 2001, sentencing hearing, Mr. Riggs argued that the court should consider several mitigating factors to reduce petitioner's sentence.  In particular, Mr. Riggs argued that the court should consider that petitioner was a poly-substance abuser of alcohol and cocaine, he stole a small amount of money, he appeared to be a non-violent person and grand theft of a person was a "wobbler," meaning it could have been charged as a misdemeanor. Transcript from December 21, 2001, hearing, pp. 4-6.  The court rejected these arguments and sentenced petitioner to 29 years to life.

Petitioner now argues that Mr. McBride and Mr. Riggs were ineffective for failing to raise the issues of his mental illness and traumatic childhood in support of their motions to strike petitioner's prior convictions.  In support of the claim that petitioner had a traumatic childhood, petitioner has presented the declarations of his sister, Louise Jenkins, and his half-

1   sister, Joyce Nisby.  Ms. Jenkins states that petitioner was beaten by his step-father.  Petitioner's

2   Exhibit B.  When petitioner was approximately ten years old, he witnessed his mother put out his

3   step-father's eye in a violent assault.  Id.  Ms. Nisby states that she was present when petitioner

4   witnessed their mother put out their step-father's eye.  Petitioner's Exhibit C.

5          In support of his claim that he was mentally ill, petitioner has presented records

6   from Napa State Hospital indicating that he was diagnosed as suffering from chronic paranoid

7   schizophrenia after he was committed there three times within the course of several months when

8   he was nineteen years old.  Petitioner's Exhibit D.  The entry from July 21, 1977, states,

9          Symptoms today, paranoid and grandiose delusions.  He thinks people are after
           him trying to harm him.  He has the grandiose idea of how smart he is, so much
10         more so than other people around him.  He has responded to hallucinatory voices,
           auditory hallucinations while in jail but denies hallucinations today.  He is now
11         correctly oriented.  Memory is intact.  He is functioning in the dull-normal range
           of intelligence.  He is semi-literate.  He is afraid that people are coming at him,
12         trying to harm him.  Affect is flat, blunted and inappropriate.  He is suspicious and
           rather fearful of other people, particularly white people.  His speech is blocked
13         with little spontaneity and his answers to questions are guarded, evasive and
           sometimes not truthful.  He has no insight into his situation and denies mental
14         illness.  When he was here before he said he did not want to be here and didn't
           believe that he belonged here.  Now he says that he would rather be here than be
15         in jail.  Judgment poor, insight lacking, impulse control poor.

16   Petitioner's Exhibit D.

17          An entry in petitioner's medical records from October 17, 2001, while he was

18   waiting to be sentenced on the conviction challenged in the instant action states,

19         A 43 y/o SBM long hr MI, hospitalized Napa 1982 and treated c Haldol and
           Prolixin.
20         Now presents c hearing telling him he "deserves what I got, telling me not to eat, I
           should commit suicide."  Says never had out-pt treatment but at Napa State Hosp
21         several times.
           Alert, OX3, hyperverbal, pressured to talk about "I have 3 strikes," thoughts
22         surprisingly well organized though rambling.  Auditory hallucinations, no active
           suicidal preoccupation, no homicidal thoughts.
23         A-schizophrenia, paranoid type, chrno.
           P.  Rx Haldol...
24

25   Petitioner's Exhibit F.

26   \\\\\

1        In her declaration, Ms. Jenkins states that the last time she saw petitioner, he was

2  out of custody and asked her to take him to Napa State Hospital.  Petitioner's Exhibit B. She

3  states that petitioner was crying in her backyard and saying that things were talking to him telling

4  him to take drugs.  Id.

5        Petitioner has also presented the declaration of Mr. Riggs, in which he discusses

6  why he failed to present evidence of petitioner's mental illness.  He states, in relevant part,

7         During the course of my representation of defendant for the Motion for New Trial
           and subsequent sentencing, I spent approximately 7.3 hours meeting with him and
8          interviewing or discussing the merits of his case, or lack thereof.  A segment of
           this time was spent in fact finding about the defendant's personal history.
9
           During this fact finding segment, the defendant indicated that he had been at Napa
10         State Hospital in the "Seventies."  It is my recollection that I asked the defendant
           whether or not this had resulted from a California Welfare and Institutions Code
11         section 5150 proceeding.  When I probed that area of our discussion, he could not
           remember exactly why he had been at Napa State Hospital.  Further, he minimized
12         the significance of this event in his life.  I became further interested in his
           background, because, as I told him, he seemed to be an intelligent, and likeable
13         guy, but had really wasted his life.  I asked him if he had any family members that
           could relate more of his history.  He indicated that he had no family that I could
14         contact.  He stated that there was "no one."

15         During my representation of the defendant, I reviewed the court file.  Nothing in
           the court file reflected that the client was currently suffering, or had suffered from
16         mental health issues, other than alcohol and cocaine addiction.

17         I also spoke with defendant's prior attorneys, regarding the merits of defendant's
           case, including their impressions of the defendant.  In addition, I spoke with the
18         investigator who worked on defendant's case about his investigation.  In these
           meetings, with prior attorney(s) and the investigator, I did not learn about any
19         information that related to mental health issues, (other than alcohol and cocaine
           addiction).
20
           Defendant's Pre-Sentence Probation Report include's the defendant's own
21         statement that, "The defendant reported no physical or mental health problems."
           (Page 5 Line 14, 15).  This report was authored, and filed prior to my
22         representation, and it was one of the documents I reviewed prior to meeting with
           the defendant.
23
           In addition, defendant's personal statement attached to the probation report, and
24         thereby incorporated into the record, does not mention anything about mental
           health issues, other than his alcohol and cocaine usage and addiction.
25
           My notes of my argument at sentencing indicates that I made a record that the
26         defendant's activity was mitigating and therefore fell within California Rule of

1      Court 423(b)(2), in that the defendant was suffering from a mental or physical
2      condition, namely, poly-substance abuse: alcohol and cocaine dependency
       intoxication.

3      During my representation of the defendant and my person interviews with
4      defendant, he did not exhibit any signs of mental illness, my experience as a
       criminal defense lawyer includes the representation of clients suffering from a
5      host of mental health issues, in juvenile, adult (Penal Code section 1026 jury trials
       and Penal Code section 1368 proceedings), and LPS conservatorships, as well as
6      probate conservatorship civil cases, involving elderly clients with severe
       dementia.  Other than alcohol and cocaine issues, the defendant did not display
7      any mental illness symptoms similar to those clients.  To the best of my
       knowledge he was not housed or classified as an inmate with mental health issues.

8      During my interaction with the defendant, he kept a "clip file" of recent and
       relevant cases, and local news articles relating to his case.  He stated that he
9      obtained much of this legal information from the jail law library, and indicated
       that he used the library often to work on his case, even befriending the inmate
10     who ran the library.  He had a clear understanding of how his research related to
       the charges against him, and he had a clear understanding about all of the defense
11     work that had been implemented on his behalf.  He often offered to aid in the
       defense work that was performed on his behalf.  His first hand observations about
12     his experiences were insightful, relevant, and helpful to the preparation of his
       defense.

13

14  Petitioner's Exhibit G.

15      Petitioner has not provided the court with a declaration by Mr. McBride.

16  However, in his own declaration, petitioner's present counsel states that Mr. McBride was

17  apparently unwilling to provide him with a declaration regarding the issues raised in this action.

18  Petitioner's Exhibit A.

19      Petitioner has not moved for an evidentiary hearing regarding the issue of why

20  Mr. McBride failed to investigate his childhood and mental illness.  Even if petitioner had so

21  moved, the court would not hold an evidentiary hearing because petitioner would not be able to

22  show that the <u>Strickland</u> prejudice prong, a mixed question of fact and law, and hence, ultimately

23  a question of law, that the California courts acted unreasonably in their legal determination that

24  petitioner suffered prejudice.  With respect to the present claim, petitioner would have to show

25  that but for Mr. McBride's failure to present evidence of his traumatic childhood and mental

26  illness, the trial court would have stricken his prior convictions and not sentenced him pursuant

to the Three Strikes Law.  As will be discussed below, this court finds that even had the trial

court heard evidence regarding petitioner's childhood trauma and mental illness, petitioner would

have received the same sentence.

        In rejecting petitioner's ineffective assistance of counsel claim the California

Court of Appeal found that petitioner did not present adequate evidence that either of his

attorneys had any factual basis to suspect that petitioner suffered from a mental illness or an

unusually traumatic childhood:

> Jenkins's first trial counsel, McBride, states that he saw nothing in the files to indicate that Jenkins suffered from such a condition.  Riggs, who was appointed after the trial to file a motion for new trial, declares that the pre-sentence probation report included Jenkins's own statement that he did not have any mental health problems, that Jenkins exhibited no signs of mental illness in his interviews, and actively and ably assisted Riggs in performing work in aid of his defense.  Jenkins did mention that he had been at Napa State hospital in the 70's, but could not remember why, and "minimized the significance of this event in his life."

> Similarly, with respect to the evidence of the violence and trauma in his childhood home, Jenkins did not himself report this personal history, and he provided McBride with the name of only one relative, who McBride tried, unsuccessfully, to contact, and told Riggs there was "no one" he could contact.

> On this showing there is simply no prima facie case that trial counsel knew, or should have known, that Jenkins might have a mental illness, and that further investigation could lead to the discovery of favorable evidence.  "Criminal trial counsel have no blanket obligation to investigate 'mental' defenses, even in a capital case." (People v. Gonzales, supra, 51 Cal.3d at pp. 1244.)  The case upon which Jenkins relies, People v. Mozingo (1983) 34 Cal.3d 926, is distinguishable, because in that case, the prosecutor had given trial counsel a file that included Mentally Disordered Sex Offender reports which contained significant indications of a psychiatric problem.  (Id. at p. 932).

Respondent's Exhibit F, pp. 2-3.

        With respect to Mr. McBride, the court cannot evaluate the reasonableness prong

of the Strickland test because it does not have any evidence before it regarding why Mr. McBride

acted as he did.  However, with respect to Mr. Riggs, the court finds that the California Court of

Appeal's finding that he did not act unreasonably was not an unreasonable application of clearly

established Supreme Court authority.  This court agrees that nothing in the record suggests that

1   Mr. Riggs knew, or should have known, that petitioner might have had a mental illness, and that

2   further investigation could have led to the discovery of favorable evidence.

3            In his petition and traverse, petitioner cites several cases in support of his

4   argument that counsel had a duty to investigate petitioner's mental illness: Evans v. Lewis, 855

5   F.3d 633, 636 (9th Cir. 1988); Smith v. Stewart, 189 F.3d 1004, 1009 (9th Cir. 1999); Correll v.

6   Stewart, 137 F.3d 1404, 1414-1415 (9th Cir. 1998).  These cases involve counsel's obligations in

7   capital cases during the penalty phase.  This court is aware of no clearly established Supreme

8   Court authority requiring counsel in non-capital cases to investigate potential mitigating evidence

9   of mental illness prior to sentencing if the record does not suggest that the petitioner has or had a

10  serious mental illness.

11           In his state habeas petition, petitioner argued that his mental illness constituted

12  newly discovered evidence entitling him to habeas relief.  The California Court of Appeal

13  rejected this claim on grounds that it was not more likely than not that evidence of his mental

14  illness would have resulted in a different outcome on his motions to strike his prior convictions.

15  While the California Court of Appeal did not explicitly address the prejudice prong of the

16  Strickland test, this court finds its reasoning regarding petitioner's newly discovered evidence

17  claim to be persuasive regarding this issue:

18           Nor is it, "more likely than not" that this evidence, if presented, would have
             resulted in a different outcome on the motions to strike his prior convictions, or to
19           reduce the current conviction to a misdemeanor.  Evidence of mental illness is, of
             course, a recognized factor in mitigation, if it significantly reduces culpability for
20           the crime.

21           Although evidence of mental illness would not have been strictly cumulative of
             the evidence of substance abuse already presented to the court, it is unlikely that it
22           would have made a qualitative difference in the court's exercise of discretion to
             deny these motions.  To support the exercise of discretion to grant a motion to
23           strike, the evidence must persuade the court that the defendant is outside the
             scheme of the Three Strikes law.  (People v. Williams (1998) 17 Cal.4th 148, 161;
24           People v. Garcia (1999) 20 Cal.4th 490, 499-500.)  Petitioner presents no
             evidence that the diagnosed mental illness actually played any role in the
25           commission of the current offense, and his own statement concerning the
             circumstances of the offense does not suggest that he was suffering symptoms of
26           his mental illness when he committed it.  Nor does he present any evidence

                                                    12

linking his illness to the commission of his prior offenses.  Neither of his
attorneys observed any sign of mental illness, and the records he submits show
that he did not manifest any symptoms in jail until just before sentencing under
stress that he was facing a Three Strikes sentence.  Thus, even if the evidence of
the diagnosis in 1977 and of the October 2001, apparent relapse were credited,
there is no nexus established between the mental illness, his current offense, his
prior convictions, and the innumerable parole violations in the intervening years.
The court, in denying appellant's motion to strike stated that in light of appellant's
record of recidivism, it might even be an abuse of discretion for it to grant the
motion.  The standard for collateral relief requires more than the mere possibility
that the "new" evidence, might have produced a more favorable result.
Petitioner's showing simply does not rise to the much higher standard of
presenting newly discovered evidence which "more likely than not" would have
altered the outcome.

Respondent's Exhibit F, pp. 3-4.

Based on the reasoning of the California Court of Appeal, this court finds that

petitioner has not met his burden in demonstrating unreasonableness on the part of the California

courts.  Based on petitioner's extensive criminal history and because petitioner did not directly

link his mental illness to the charged offenses, there is no reasonable probability that introduction

of this evidence would have changed the outcome of petitioner's motions to strike his prior

convictions.

This court also finds that there is no reasonable likelihood that the outcome of his

motions to strike his prior convictions would have been different had counsel introduced

evidence of petitioner's traumatic childhood.  Based on his extensive criminal history, evidence

of petitioner's troubled upbringing would not have changed the outcome.

For the reasons discussed above, the court finds that petitioner's ineffective

assistance of counsel claim should be denied.

B.  Eighth Amendment

Petitioner raised this claim in his state habeas petitions.  The California Court of

Appeal issued a decision explaining its reasons for denying this claim.  Respondent's Exhibit F.

The California Supreme Court denied petitioner's habeas corpus petition without comment or

citation.  Respondent's Exhibit I.  Accordingly, the court looks through the decision of the

1  California Supreme Court to determine whether the explained decision by the California Court of

2  Appeal was objectively reasonable.

3         Petitioner argues that his sentence violates the Eighth Amendment because it is

4  disproportionate to his crimes.

5         In <u>Lockyer v. Andrade</u>, 538 U.S. 63, 123 S. Ct. 1166 (2003), the Supreme Court

6  established that although a sentence that is "grossly disproportionate" to the crime committed

7  violates the Eighth Amendment prohibition against cruel and unusual punishment, state

8  legislative policies directed to the problem of criminal recidivism are an important factor and are

9  entitled to great deference in weighing the "gravity of the offense" for which an enhanced

10  sentence is given under state repeat offender laws.  <u>Id</u>. at 72.  Deference given to state recidivism

11  policies in Eighth Amendment cases, however, is not unlimited.  <u>Id</u>.  And in some "exceedingly

12  rare" and "extreme case[s]," sentences validly imposed under a state recidivism statute may still

13  violate the Eighth Amendment.  <u>Id</u>.

14         It is only necessary to review <u>Ewing v. California</u>, 538 U.S. 11, 123 S. Ct. 1179

15  (2003) and <u>Lockyer</u> to understand that petitioner's claim herein cannot overcome the AEDPA

16  "unreasonable" barrier.  Each case involved an Eighth Amendment challenge after the sentences

17  for relatively minor offenses were greatly enhanced pursuant to state repeat offender laws.  They

18  also involved enhanced sentences that mandated a minimum term of imprisonment by reason of

19  the defendant's repeat offender status that was higher than the maximum prison term that could

20  have been imposed for the same crime as a first offense.  In each of these cases, the Supreme

21  Court first found that the "gross disproportionality" standard was the applicable legal standard.

22  Next, the Court reasoned that the "gravity of the offense" for which the enhanced sentence was

23  imposed must be assessed under the Eighth Amendment, not only by reference to the nature and

24  severity of the triggering offense, but also by reference to the state's recidivism policy, as

25  expressed in the state's repeat offender statutes, and to the totality of the offender's criminal

26  history.

1    In Lockyer and Ewing, the Supreme Court affirmed California Three Strikes Law

2  sentences for two "career criminals" with lengthy criminal histories and triggering offenses that

3  repeated their prior crimes.  In Lockyer, a federal habeas proceeding, the defendant was

4  convicted of two felony counts of petty theft with a prior conviction and sentenced to two

5  consecutive terms of 25 years to life.  Andrade's criminal history included the following

6  activities: multiple counts of burglary, for which he was sentenced 120 months in prison;

7  misdemeanor theft, for which he was sentenced to six days in jail with a year of probation;

8  transportation of marijuana, for which he was sentenced to eight years in federal prison;

9  misdemeanor theft, for which he was sentenced to 180 days in jail; and transportation of

10  marijuana, for which he was sentenced to 191 days in federal prison.  He was also arrested for a

11  state parole violation arising from his escape from federal prison.  The Supreme Court held that

12  because "the precise contours" of the gross disproportionality principle were "unclear" the state

13  court did not make an objectively unreasonable application of clearly established federal law.

14  Lockyer, 538 U.S. at 68-70.

15    In Ewing, a direct appeal case, the Supreme Court affirmed the state court's

16  upholding of Ewing's sentence of 25 years to life in prison.  Ewing, 538 U.S. at 29-30.  The

17  triggering offense for Three Strikes Law purposes was grand theft of $1,200 of merchandise and

18  was petitioner's fifteenth conviction for which he had previously served nine separate terms of

19  incarceration.  Id. at 18.  Petitioner's criminal history evidenced a pattern of increasing violence.

20  While noting that Ewing's triggering offense of grand theft "was certainly not one of the most

21  passive felonies a person could commit . . . . In weighing the gravity of Ewing's offense, we must

22  place on the scales not only his current felony, but also his long history of felony recidivism.

23  Any other approach would fail to accord proper deference to the policy judgments that find

24  expression in the legislature's choice of sanctions."  Id. at 28-30.  After careful consideration of

25  Ewing's triggering offense, along with his long, violent criminal history, the Court ruled that

26  Ewing's sentence did not raise an inference of gross disproportionality.  Id. at 30.

15

A copy of petitioner's criminal history is attached to the probation officer's report filed by respondent:

  1.  1976–convicted of Cal. Bus. & Prof. Code § 25665 (misdemeanor); sentenced to 36 months probation.

  2.  1977–convicted of Cal. Penal Code § 211 ( robbery) (felony); sentenced to 60 months state prison.

  3.  1979–convicted of Cal. Penal Code § 211 (robbery) (felony); sentenced to 5 years state prison.

  4.  1984–convicted of Cal. Penal Code § 487.2 (grand theft from a person) (felony); sentenced to 5 years state prison.

  5.  1987–convicted of Cal. Health & Saf. Code § 11350 (possession of a controlled substance) (felony); sentenced to 4 years state prison.

  6.  1988–convicted of parole violation.

  7.  1989–convicted of parole violation.

  8. 1990–convicted of parole violation.

  9.  1991–convicted of parole violation.

  10.  1992–convicted of parole violation.

  11.  1992–convicted of Cal. Health & Saf. Code § 11352 (sale of a controlled substance) (felony); sentenced to 8 years state prison.

  12.  1997–convicted of Cal. Penal Code § 148(a) (resisting arrest) (misdemeanor).

  13.  1998–convicted of Cal. Health & Saf. Code § 11364 (possession of drug paraphernalia) (misdemeanor).

  14.  1998–convicted of Cal. Vehicle Code § 40509(a) (failure to appear) (misdemeanor).

  15.  2000–convicted of Cal. Penal Code § 487(c) (grand theft) (felony).

In light of these two cases, petitioner's sentence is not grossly disproportionate to the crime committed for Eighth  Amendment purposes in light of his criminal history. Petitioner's two prior convictions were for robbery.  As did the defendants in Ewing and Lockyer, petitioner has a lengthy criminal history, and he has been incarcerated several times.

\\\\\

16

1    In a recent case decided post <u>Lockyer</u> and <u>Ewing</u>, the Ninth Circuit found that the

2  25-year-to-life sentence under the Three Strikes Law was unconstitutional where imposed for a

3  third offense of shoplifting a $199 VCR and the petitioner's prior criminal history consisted

4  solely of two convictions for second-degree robbery upon a single guilty plea.  <u>Ramirez v.</u>

5  <u>Castro</u>, 365 F.3d 755 (9th Cir. 2004).  The federal appellate court held that these facts constituted

6  one of those "exceedingly rare" cases, referenced in <u>Lockyer v. Andrade, supra</u>, in which the

7  sentence imposed was grossly disproportionate.  <u>Ramirez</u>, 365 F.3d at 756-57.  Prosecutors in the

8  1996 charge used two nonviolent shoplifting offenses committed in 1991 to which petitioner had

9  pled guilty for which he had served one sentence of just over six months in county jail to charge

10  petitioner with one count of petty theft with a prior theft-related conviction, punishable as a

11  felony, after which the jury found the 1991 convictions were strikes.  <u>Id.</u> at 756.  Although the

12  trial court, pre-trial, had indicated an inclination to do so, it denied Ramirez's motion to strike

13  one or both of the two prior shoplifts.  <u>Id</u>.  The 25 year-to-life sentence imposed for three

14  shoplifting convictions, the Ninth Circuit noted, was more severe than that which would have

15  been imposed if any of the crimes had been murder, manslaughter or rape.  <u>Id</u>.

16    Ramirez pled guilty to the two earlier shoplifting offenses, unaware that he was

17  putting two strikes on his record, since the Three Strikes Law had not yet been enacted.  <u>Id</u>. at

18  757.   He took the plea for a one year sentence in county jail and three years probation after

19  having allegedly been told that his failure to do so would result in his sister, also implicated in

20  one of the shoplifts, being sentenced to five years in prison.  <u>Id</u>.  Ramirez served six months and

21  twenty days, was released and completed probation without incident.  <u>Id</u>.  Ramirez had no

22  encounters with the law until the third shoplifting offense several years later in which no force or

23  violence was associated; minimal force was associated with the prior offenses.  <u>Id</u>. at 757-58.

24  Ramirez could have been charged with a misdemeanor petty theft and sentenced to a maximum

25  of six months in jail.  <u>Id</u>. at 758.  Ramirez, unlike the recidivists in <u>Rummel</u>, <u>Solem</u>, <u>Ewing</u> and

26  <u>Andrade</u>, (and unlike petitioner herein) had never been sentenced to state prison, and in his entire

17

1     criminal history, had only served one period of incarceration in county jail. Id., at 769. Finding

2     Ramirez's case to constitute one of "the extremely rare case that gives rise to an inference of

3     gross disproportionality,...." the court proceeded to a comparative analysis of his sentence, intra

4     and inter jurisdictionally. Id ., at 770-773. The state court was ultimately found to have

5     unreasonably applied the gross disproportionality principle to the "unique facts of Ramirez's

6     case." Id., at 774.

7               In light of Lockyer and Ewing, petitioner's sentence herein could only be found to

8     be grossly disproportionate to the crime committed for Eighth Amendment purposes if the facts

9     of his case were sufficiently analogous to those of the "extremely rare" case identified in

10     Ramirez. While the offense that led to petitioner's Three Strikes sentence could have been

11     charged as a misdemeanor, his criminal history was more extensive than Ramirez and involved

12     incarceration in state prison. Petitioner's criminal history does not demonstrate a criminal record

13     sufficiently analogous to that of Ramirez to warrant habeas relief.

14               Petitioner also suggests that is it unconstitutional to sentence a mentally ill person

15     to 25 years to life whose offense did not involve injury.

16               With respect to mental illness, the Supreme Court has only intervened in an

17     Eighth Amendment sentencing context in capital cases; it held that seriously mentally retarded

18     persons could not be given the death penalty. Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242

19     (2002). And, that action was taken only recently. The undersigned cannot say in this AEDPA

20     context that in non-capital cases clearly established Eighth Amendment law *requires* the

21     consideration of mitigating factors. Indeed, circuit courts have held that it does not.

22            Uphoff's five year sentence does not violate the Eighth Amendment or any other
                    provision of the federal Constitution. There was ample evidence by which the jury

23            could reject his insanity defense, and the imposition of a statutory mandatory
                    sentence without consideration of mitigating factors does not violate the Eighth

24            Amendment in circumstances like this. See Harmelin v. Michigan, 501 U.S. 957,
                    994-95, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991); United States v. Rudolph, 970

25            F.2d 467, 469 (8th Cir.1992).

26     U.S. v. Uphoff, 232 F.3d 624, 626 (8th Cir. 2000).

1    The denial of this claim by the California Court of Appeal was not an

2 unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim

3 should be denied.

4    Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

5 a writ of habeas corpus be denied.

6    These findings and recommendations are submitted to the United States District

7 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

8 days after being served with these findings and recommendations, any party may file written

9 objections with the court and serve a copy on all parties.  Such a document should be captioned

10 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

11 shall be served and filed within ten days after service of the objections.  The parties are advised

12 that failure to file objections within the specified time may waive the right to appeal the District

13 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

14 DATED:   3/6/06

15

16

17                              /s/ Gregory G. Hollows

18                              GREGORY G. HOLLOWS
                              UNITED STATES MAGISTRATE JUDGE

19

20 ggh:kj
   jenk1656.157

21

22

23

24

25

26